In re SOUTHERN PROPERTIES, IN-
CORPORATED t/a Pardners
Restaurant and Lounge, Debtor.

RICHMOND FIXTURE & EQUIPMENT
COMPANY, Plaintiff,

v.

Robert E. HYMAN, Trustee in Bank-
ruptcy for Southern Properties,
Incorporated, Defendant.

Bankruptcy No. 83–01581–R.
Adv. No. 84–0029–R.

United States Bankruptcy Court,
E.D. Virginia,
Richmond Division.

Dec. 3, 1984.

Robert L. Flax, Richmond, Va., for plaintiff.

John F. Ames, Richmond, Va., for defendant.

## MEMORANDUM OPINION

BLACKWELL N. SHELLEY, Bankruptcy Judge.

This matter came before the Court upon the filing of a motion for relief from stay by Richmond Fixture & Equipment Company. After holding a hearing on the plaintiff's motion for relief from stay, this Court took the matter under advisement. The parties submitted memoranda of law in

support of their respective positions and requested oral argument thereon. After considering the evidence adduced at the hearing and argument by counsel, this Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

On or about May 17, 1980 Richmond Fixture & Equipment Company ("Richmond Fixture") entered into a contract with and sold to Walter Chewning ("Chewning") certain items of restaurant equipment (the "property"). The parties executed a written contract and security agreement dated May 8, 1980.

Richmond Fixture perfected its security interest in the property sold to Chewning by properly filing the required financing statements. The written contract prohibits Chewning from selling the property sold to him by Richmond Fixture unless the sale was agreed to by Richmond Fixture. In addition to Richmond Fixture's consent of such a sale, Chewning was required, by the contract, to pay a $100.00 transfer fee to Richmond Fixture.

On or about July 23, 1982, Chewning sold his restaurant business and the property to the debtor, Southern Properties, Inc. ("Southern Properties"). The transfer fee was paid to Richmond Fixture. Southern Properties assumed the existing security agreement between Richmond Fixture and Chewning "with full rights and responsibilities." However, Richmond Fixture did not record a new financing statement or an amendment or extension of the previously filed financing statement with regard to the property.

Southern Properties filed for relief in bankruptcy pursuant to Chapter 11 of the Bankruptcy Code on October 24, 1983. Upon motion by the debtor, this Court entered an Order on January 17, 1984 granting the debtor's motion to convert the debtor's bankruptcy proceeding to Chapter 7 of the Bankruptcy Code. Robert E. Hyman was appointed interim trustee on January 23, 1984, accepted the appointment on January 25, 1984, and is acting at this time as trustee for the debtor.

## CONCLUSIONS OF LAW

Richmond Fixture has sought relief from the automatic stay provisions of 11 U.S.C. § 362(a) in order to recover property first sold to Chewning and later sold to the debtor. Pursuant to 11 U.S.C. § 362(d), a creditor is entitled to relief and the Court shall grant such relief from the automatic stay:

> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or (2) with respect to a stay of an act against property, if—(A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d). Richmond Fixture contends that because it has a lien on the property in excess of its value and because the debtor is now in Chapter 7 (liquidation rather than reorganization proceedings) the requirements of § 362(d)(2) are satisfied.

The trustee has opposed Richmond Fixture's motion on the ground that his interest in the property is superior to any interest Richmond Fixture may have because Richmond Fixture does not have a perfected security interest. The basis of the trustee's position is that pursuant to 11 U.S.C. § 544(a) the trustee stands in the position of a lien creditor on the date the petition in bankruptcy is filed and, thereby, has an interest in property of the debtor superior to an unperfected security interest. Richmond Fixture argues that the debtor expressly assumed its security agreement with respect to the property, thereby continuing a valid security interest, and that the security interest remained perfected and thereby effective against the trustee because no further financing statement filing was required. Therefore, the precise issue presented to this Court by the parties is whether Richmond Fixture has a perfected security interest in the property which Southern Properties purchased from Chewning.

■ Although not addressed by any of the parties this Court feels obliged to briefly address the issue of whether Article 6 of the Uniform Commercial Code, as adopted in Virginia, applies to the instant matter. Generally, transactions similar to that involved in this case are considered a "bulk sale" because in selling the property in question here to Southern Properties, Chewning was transferring a major part of the materials, supplies, merchandise and other inventory of the business to another entity which was a sale not in the ordinary course of Chewning's business. *See Va. Code* § 8.6–102(1) (Repl.Vol.1965). However, the Virginia Supreme Court has held that a sale of the equipment and fixtures employed in the operation of a restaurant are not covered by the bulk sale provisions of the pre-Uniform Commercial Code (UCC) Virginia Bulk Sales Act. *See O'Connor v. Smith,* 188 Va. 214, 49 S.E.2d 310 (1948). The same result is reached under the UCC and Virginia Code § 8.6–102(3). *See, Va. Code* § 8.6–102, Official Comment No. 2, Virginia Comment (Repl.Vol.1965). Therefore, it appears clear that the instant matter is properly determined with reference to the provisions of Article 9 of the Uniform Commercial Code as enacted in Virginia.

The issue before the Court turns on the application of the commercial law of Virginia regarding the validity and perfection of security interests in personal property. The parties stipulate that when Richmond Fixture sold the property to Chewning that it properly perfected a security interest in the property. The parties disagree, however, as to whether a perfected security interest continued in the property in favor of Richmond Fixture after the authorized sale to the debtor, Southern Properties. Should Richmond Fixture have such a perfected security interest, relief from the automatic stay would be appropriate because the debtor lacks equity in the property and the property is not necessary for an effective reorganization inasmuch as the debtor has converted to Chapter 7. *See* 11 U.S.C. § 362(d)(2).

■ Pursuant to § 544(a) of the Bankruptcy Code, the trustee in bankruptcy, as a hypothetical lien creditor on the date of filing, defeats any holder of an unperfected security interest. Therefore, in order for Richmond Fixture to prevail in the instant matter it must demonstrate that it has a perfected security interest in the property. The trustee has conceded that Richmond Fixture had a properly perfected security interest in the equipment with respect to the initial sale to Chewning. Thus, that issue need not concern us here. Rather, Richmond Fixture's burden involves proof on two major issues: 1) whether Richmond Fixture's security interest was retained upon the authorized transfer to Southern Properties; and 2) if Richmond Fixture's security interest survived the transfer, whether further filing of financing statements was required to maintain its priority status.

*1. Did Richmond Fixture retain its security interest when it authorized the transfer of the property to the debtor?*

The agreement between Richmond Fixture and Chewning was expressly assumed by Southern Properties. No statute, regulation, or policy appears to restrict the voluntary assumption of such an agreement by another party; thus, the transaction would appear to be governed by general contract law. In fact, it would frustrate the Uniform Commercial Code's policy of encouraging commercial transactions to defeat the security interest in this matter. In addition, none of the parties have argued that the assumption of the security agreement between Richmond Fixture and Southern Properties was not valid and enforceable. For these reasons, this Court finds that a valid and enforceable agreement was assumed between Richmond Fixture and Southern Properties. Thus, Richmond Fixture retained its security interest unless Virginia Code § 8.9–306(2) would require a different result.

The Uniform Commercial Code as adopted in Virginia provides that "a security interest continues in collateral notwithstanding a sale, exchange, or other disposi-

tion thereof *unless the disposition was authorized by the secured party in the security agreement or otherwise ....*" *Va. Code* § 8.9–306(2) (Cumm.Supp.1984) (Emphasis added). Based upon this Code section the trustee argues that because Richmond Fixture authorized the sale of the property, its security interest does not continue and, therefore, the trustee should prevail.

No dispute exists as to the fact that Richmond Fixture authorized the sale of the property. The question that remains is the effect of Richmond Fixture's authorization. The facts are clear that Richmond Fixture's authorization was conditional. Richmond Fixture authorized the sale with the proviso that Southern Properties assume the existing security agreement between Chewning and Richmond Fixture.

The Supreme Court of Virginia has considered *Va. Code* § 8.9–306(2) in the case of *Graves Construction Co. v. Rockingham National Bank*, 220 Va. 844, 849, 263 S.E.2d 408, 411 (1980). The trustee argues that this Court's determination herein is controlled by the Virginia Supreme Court's decision in *Graves.* The trustee relies on the holding in that case that a sale of collateral authorized by the secured party terminates that party's security interest in the collateral.

In *Graves,* a bank retained a security interest in a subcontractor's inventory among other things. The security agreement between the parties expressly authorized the subcontractor to sell items of inventory to the general contractor with the bank receiving a security interest in the proceeds of the sale but releasing any interest in the collateral. The contract between the general and subcontractor provided that the general took the inventory items free of any security interest once the subcontractor received progress payments. When the subcontractor experienced financial trouble, a dispute arose between the bank and the general contractor over certain property transferred to the general contractor from the subcontractor upon which progress payments had been made.

The court ruled that the bank forfeited its security interest in the property itself in authorizing the sale from the subcontractor to the general contractor.

In the instant matter, two relevant facts differ significantly. First, the type of collateral in this case is equipment as opposed to inventory as was involved in *Graves.* Second, in the case at bar, the transfer was prohibited by the security agreement unless otherwise authorized by Richmond Fixture. Only on the condition of the debtor's assumption of the security interest did Richmond Fixture authorize the transfer. In contrast, there was explicit authorization in *Graves* for the sale of the property free and clear without assumption of the security interest.

These different facts require a consideration of what is meant in the statute by "authorization" in light of what objective is sought to be achieved by the statute. On the one hand, "authorization" may be read to mean *any* authorization regardless of any conditions which may be attached. On the other hand, "authorization" may mean authorization to sell free and clear of the security interest. If the former interpretation is accepted, then the trustee must prevail and the rule in *Graves* would apply even to the set of facts before the Court now. If the latter interpretation is adopted, then Richmond Fixture's security interest in the property survived the authorized transfer because they did not authorize that the property be transferred free and clear of their security interest.

The objective sought to be accomplished by *Va. Code* § 8.9–306(2) leads this Court to conclude that a secured party only forfeits its security interest in collateral pursuant to that Code section when collateral is authorized by the secured party to be transferred free and clear of that party's security interest. The Code section appears to apply primarily to situations where inventory is sold. In those situations, the parties contemplate that the collateral will be sold free and clear of the security interest. The secured party remains protected because the Code provides

that its security interest will continue in the *proceeds* of the sale of the collateral. Moreover, the provision clearly provides that the secured party maintains his security interest when the transfer is not authorized, thus, the purpose is to protect rather than defeat security interests. The inventory situation is that addressed by the Virginia Supreme Court in *Graves*. Consequently, the *Graves* court's interpretation of *Va.Code* § 8.9–306(2) must be considered in light of the fact that the court was addressing the problem of inventory as opposed to equipment.

■ A second factor which might lead this Court to conclude that Richmond Fixture's security interest continued in the property subsequent to the transfer to Southern Properties is that to decide otherwise would be to apply a Code section in a manner which frustrated the clear intent of the parties to the transaction. The parties intended the security interest to continue. In *Graves* the parties contemplated that the purchaser would take the property free and clear of the bank's lien. The Code was drafted to facilitate commercial transactions and freedom of contract. To rule that Richmond Fixture should forfeit its security interest would frustrate the parties' intent, unnecessarily restrict freedom of contract and, thereby, inhibit commercial activity, all of which would be contrary to the purpose behind enacting the Uniform Commercial Code.

Finally, other courts addressing application of this provision have assumed that "authorization" means authorization to transfer free and clear of the security interest. An Intermediate Court of Appeals in California stated its view in the following manner:

> We hold that when a security agreement expressly prohibits the disposition of collateral without the written consent of the secured party, in order for a court to find authorization permitting disposition free of the security interest within the meaning of § 9306, subdivision 2, there must either be actual, prior or subsequent consent in writing by the secured creditor
>
> *manifesting a purpose to authorize the disposition free of the security interest.*

*Central California Equipment Company v. Dolk Tractor Company*, 78 Cal.App.3d 855, 862, 144 Cal.Rptr. 367, 371 (1978) (Emphasis added) (where the issue was whether or not the authorization must be in writing).

■ For the reasons expressed above, the provision in *Va.Code* § 8.9–306(2) should be construed so that a secured party's security interest in transferred collateral is lost only where there is a clear manifestation of the secured party's intent that the collateral be transferred free and clear of its security interest. To defeat Richmond Fixture's security interest pursuant to § 8.9–306(2) would disrupt rather than encourage commercial transactions between parties. There was nothing commercially unreasonable about the parties' intent to create a legal relationship based upon the previously existing security agreement. Consequently, this Court holds that Richmond Fixture had a valid security interest in the property after the transfer from Chewning to Southern Properties.

*2. Was further filing of financing statements by Richmond Fixture required to maintain its priority status?*

Having determined that after the property was transferred from Chewning to Southern Properties, Richmond Fixture maintained a security interest in that property, the final issue becomes whether that security interest remained perfected so as to defeat the trustee in bankruptcy. The trustee in bankruptcy assumes the status of a hypothetical lien creditor on the date of filing and as such will defeat any party who holds an unperfected security interest in property of the debtor. Thus, if Richmond Fixture's security interest was perfected on the date of filing, the trustee will not prevail in its attempt to use the strong-arm provisions of § 544(a) of the Bankruptcy Code.

To perfect its security interest in the property, Richmond Fixture was required by the UCC as adopted in Virginia to either

take possession of the collateral or file financing statements in the appropriate locations. The trustee argues that Richmond Fixture was required to file a new financing statement in the name of Southern Properties, the new debtor,[1] in order to perfect its security interest. Richmond Fixture, on the other hand, relies on *Va. Code* § 8.9–402(7) as relieving them from any duty to file a new financing statement. *Va. Code* § 8.9–402(7) provides in pertinent part that "a filed financing statement remains effective with respect to collateral transferred by the debtor even though the secured party knows of or consents to the transfer." *Id.* Richmond Fixture argues that they did not authorize the sale of the property free and clear of its security interest and that the security interest remained perfected because of the provisions of *Va. Code* § 8.9–402(7) and, thus, they should defeat the trustee in this matter.

The parties do not dispute that Richmond Fixture perfected a security interest in the property while in the hands of Chewning by property filing financing statements in the appropriate locations. The parties disagree as to whether a new financing statement was required to be filed by Richmond Fixture to maintain its perfected status. Thus, this Court is called upon to determine whether *Va. Code* § 8.9–402(7) relieves Richmond Fixture in this matter of filing a new financing statement to perfect the security interest which it had in the property in which this Court earlier determined survived the transfer to Southern Properties.

■ In deciding this final issue, the Court is confronted by conflicting policies underlying the Uniform Commercial Code. On the one hand, Article 9 was adopted to provide a notice system similar to that provided by the recordation of real estate conveyances. The drafters hoped to create a system whereby a party searching the files could obtain information about a debtor's property and rely upon that information in making loans secured by such property. In

order to accomplish this, financing statements generally must be filed under the debtor's name, otherwise a searcher will be unable to discover outstanding security interests. Courts construing the provisions of the Uniform Commercial Code as adopted in Virginia have emphasized strongly this notice policy underlying the Code. *See, e.g., In the Matter of Pischke*, 11 B.R. 913, 923 (Bankr.E.D.Va.1981) ("... the broad public policy rationale behind the filing of financing statements is to incorporate a uniform system of 'notice filing'."); *In re Varney Wood Products, Inc.*, 458 F.2d 435, 437 (4th Cir.1972) (the system of notice filing "contemplates further inquiry in order to determine whether a given asset is covered by a security agreement.").

■ On the other hand, Article 9 also attempts to provide certainty and protection of a secured party's interest in collateral. Thus, § 8.9–402(7) gives protection of a secured party's security interest and relieves them of any further duty to file financing statements in particular situations. Consequently, one consideration that necessarily must be made in resolving the conflict before the Court is which of these strong policies behind Article 9 should prevail or whether a reconciliation of the two policies is possible.

If the Court adopts Richmond Fixture's interpretation of § 8.9–402(7) there is significant danger that future secured lenders will be harmed by secret liens. For example, if Southern Properties had sought financing from a bank and offered its equipment as collateral for a loan the bank would search the Article 9 files under the debtor's name and would find no existing security interest filed with respect to that property. Based upon such a search the bank might reasonably rely on the filing system and make a loan to Southern Properties in exchange for a security interest in the equipment only to learn later that its position with respect to the equipment is inferior to the prior security interest of

---

**1.** In this context the term "debtor" refers to a borrower under the Uniform Commercial Code who provides collateral to the lender ("secured party") and does not refer to an entity who seeks relief in bankruptcy pursuant to Title 11 of the United States Code.

Richmond Fixture. This result seems inequitable with respect to the bank and would seem to frustrate a basic purpose behind the Article 9 filing system.

■ Although seemingly inequitable, the comments to § 8.9–402(7) clearly manifest a decision by the drafters of Article 9 that merely examining the files is not the only burden placed upon a potential secured creditor. Rather, the following draftmen's comments make clear that the bank in the above hypothetical has a duty to trace the chain of title of the proposed collateral to prior owners and then search the filed financing statements in the name of each former owner of the property to see if any security interest existed at the time the potential debtor acquired the property:

> Subsection (7) also deals with a different problem, namely whether a new filing is necessary where the collateral has been transferred from one debtor to another. This question has been much debated both in pre-Code law and under the Code. This Article now answers the question in the negative. Thus, any person searching the condition of the ownership of a debtor must make inquiry as to the debtor's source of title, and must search in the name of a former owner if circumstances seem to require it.

*Va.Code* § 8.9–402(7) Official Comment No. 8 (Cum.Supp.1984). Thus, the draftsmen appear to have reconciled any conflict between the two underlying policies by favoring certainty with respect to a secured party's security interest. This result is achieved by placing additional searching requirements upon a potential secured party. Therefore, although the searcher's task is increased, the notice system does not break down.

■ A final consideration is whether the third sentence of § 8.9–402(7) applies to this case or whether it applies to a more narrowly defined set of situations commonly referred to as "in-house" transfers. The trustee has suggested that the third sentence of § 8.9–402(7) must be read in conjunction with the first and second sentences of § 8.9–402(7) [2] and in doing so the conclusion must be reached that the third sentence does not apply to the instant matter. The first two sentences refer to "transfers" involving changes in corporate structure (*e.g.*, from partnership to corporate form) or mere name changes. In contrast, the facts before the Court at present disclose something entirely different, *i.e.*, an arms-length intercorporate transfer between unrelated entities. In addition, there is nothing in the official comment to § 8.9–402(7) which at all suggests that it should apply only to that narrow set of facts. In fact, the draftsmen's comment seems to treat the third sentence of § 8.9–402(7) as having import without reference to the prior sentences where it is written that "[s]ubsection (7) also deals with a different problem...." As written, the Code provision applies to the instant transfer and this Court holds accordingly.

■ As a consequence of the foregoing, the Court finds that Richmond Fixture was relieved of any duty to file a new or additional financing statement to perfect its security interest in the property after it was transferred to Southern Properties. Therefore, as of the date of the filing of the petition in bankruptcy by Southern Properties, Richmond Fixture had a perfected security interest in the property. Because § 544(a) only permits a trustee in bankruptcy to defeat unperfected security interests in property of the debtor, this Court should grant the motion by Rich-

---

**2.** *Va.Code* § 8.9–402(7) (Cum.Supp.1984). A financing statement sufficiently shows the name of the debtor if it gives the individual, partnership or corporate name of the debtor, whether or not it adds other trade names or the names of partners. Where the debtor so changes his name or in the case of an organization its name, identity or corporate structure that a filed financing statement becomes seriously mislead-ing, the filing is not effective to perfect a security interest in collateral acquired by the debtor more than four months after the change, unless a new appropriate financing statement is filed before the expiration of that time. A filed financing statement remains effective with respect to collateral transferred by the debtor even though the secured party knows of or consents to the transfer.

mond Fixture for relief from the automatic stay inasmuch as the debtor has neither equity in the property nor is the property necessary for an effective reorganization.

An appropriate Order will issue.