In re CATTLE COMPLEX CORP., a/k/a Chaves County Cattle Company and "3C", Debtor.

The PRODUCTION CREDIT ASSOCIATION OF SOUTHERN NEW MEXICO, Plaintiff,

v.

Jeffrey LANE, d/b/a Jeffrey Lane Cattle Company, Bank of Northern New Mexico, John Dalton, Wells Fargo Bank, Century National Bank, Washington, D.C., Cattle Complex Corporation, and Chavez County Cattle Corp., Defendants.

Bankruptcy No. 11–85–00592MR.
Adv. No. 85–0253M.

United States Bankruptcy Court,
D. New Mexico.

June 3, 1986.

Charles W. Cresswell, Las Cruces, N.M., for Production Credit Assn.

Randall H. Fields, Mark Gregory Sessions, San Antonio, Tex., Douglas T. Francis, Albuquerque, N.M., for Cattle Complex Corp.

Susan Austin, El Paso, Tex., Robert A. Johnson, Albuquerque, N.M., for Chaves County Cattle.

Daniel J. Behles, Albuquerque, N.M., for Jeffrey Lane and Bank of Northern New Mexico.

Michael Wile, Albuquerque, N.M., for John Dalton.

George D. Giddens, Jr., Roswell, N.M., for Wells Fargo Credit Corp.

## MEMORANDUM OPINION

MARK B. McFEELEY, Bankruptcy Judge.

This matter is before the Court on Production Credit Association (PCA) of Southern New Mexico's suit for Declaratory Judgment to Determine the Extent of and Validity of Liens and Interests and for Clarification of the Cash Collateral Order and Reclamation of Excess Proceeds. This memorandum opinion addresses the suit for declaratory judgment.

The issues before this Court are whether the plaintiff's security interest follows transfer of the collateral to a transferee and if so, whether the secured party must file a new financing statement to maintain his perfected security interest by naming the transferee as the debtor; if perfected, whether the plaintiff's secured interest applies to new inventory and accounts receivable acquired by the transferee and whether the secured party must trace proceeds.

The facts are these: In January 1980 Chaves County Cattle Corporation (Chaves) executed a financing statement in favor of PCA covering all accounts receivable, inventory, machinery, equipment and livestock owned or in the possession of Chaves. The financing statement was filed with the Chaves County Clerk on January 24, 1980. In June 1983 Chaves executed a security agreement in favor of PCA in accounts receivable, inventory and all machinery and equipment located at the Chaves feedlot, near Roswell, New Mexico. In July 1983 Chaves executed a promissory note to PCA in the amount of $900,000.00. In January 1984 Chaves entered into a purchase and sale agreement with Cattle Complex Corporation (CCC), a Texas corporation. Prior to the execution of the purchase and sale agreement, PCA was orally informed of the intention of Chaves to pursue the transaction with CCC. Thereafter, CCC took possession of the feedlot and all the assets located thereon and began to operate the feedlot business. While operating the feedlot, CCC purchased additional inventory and equipment and generated new accounts receivable. Following the transaction between Chaves and CCC, PCA held discussions with CCC regarding CCC assuming Chaves' indebtedness to PCA which then was approximately $350,829.56. Although an agreement was never reached allowing CCC to assume Chaves' debt, PCA accepted payments from CCC in the amount of $2,483,100.00 over a ten month period and made loan advances to CCC in the amount of $2,951,469.72 over a four month period. In September 1984 PCA made demand upon Chaves to pay the

promissory note balance. In December 1984 PCA filed a Continuation Statement for the financing statement filed in 1980, naming Chaves as the debtor and owner of the collateral. Also in December 1984 PCA filed suit in State District Court to recover on the Chaves promissory note. By agreement of the parties CCC paid two $15,-000.00 payments to PCA, one in January 1985 and one in February 1985. On April 5, 1985, Chaves filed a voluntary petition in bankruptcy pursuant to Title 11, United States Code. On April 10, 1985, CCC filed a voluntary petition in bankruptcy pursuant to Title 11, United States Code.

PCA's position is that their lien followed the collateral when it was transferred from Chaves to CCC; that the transfer of the collateral was executed without the written authorization of PCA, that their security interest remained perfected against CCC by the filing of the Continuation Statement; that new inventory and accounts receivable are subject to their security interest by virtue of the "after acquired property" clause in the security agreement and that the monies advanced after the sale date were funds advanced to Chaves and are secured pursuant to a "future advance" clause contained in the security agreement executed by Chaves.

We first address the issue of whether the security interest follows transfer of the collateral. Under New Mexico statutes a security interest continues in collateral notwithstanding the sale, exchange or other disposition thereof by the debtor unless his action was authorized by the secured party. N.M.Stat.Ann. § 55–9–306(2) (1978). Defendants contend that PCA knew of the proposed purchase and sale agreement between Chaves and CCC and never objected to it. In defendant's view, PCA "authorized" the sale of the collateral thus defeating its security interest.

Although older case law indicates that knowledge of the transfer of the collateral by the secured party cuts off the security interest, *Clovis National Bank v. Thomas*, 77 N.M. 554, 425 P.2d 726 (1967), the majority of cases holds that the security interest

is waived only if the "authorization" to transfer the collateral is clear. *Raley v. Milk Producers, Inc.*, 90 N.M. 720, 568 P.2d 246, (Ct.App.1977), *First National Bank and Trust Company of Oklahoma City v. Iowa Beef Processors, Inc.*, 626 F.2d 764 (10th Cir.1980), *Security National Bank v. Belleville Livestock Commission Co., Inc.*, 619 F.2d 840 (10th Cir.1979), *In re Southern Properties, Incorporated*, 44 B.R. 838 (Bankr.E.D.Va.1984).

In *Clovis* the Court found that "the secured party authorized the sale of the collateral, albeit not expressly, finding that the bank certainly impliedly acquiesced in and consented thereto." *Clovis, supra*, 77 N.M. at 560, 425 P.2d 726. The Court in *Clovis* cited authority for "the principle that consent may be established by implication arising from a course of conduct as well as by express words ..." *supra* at 561, 425 P.2d 726.

Significantly, the New Mexico Legislature in the 1968 amendments to the U.C.C. added:

A security interest in farm products and the proceeds thereof shall not be considered waived by the secured party by any *course of dealing* between the parties or by any trade usage. (emphasis added)

§ 50A–9–302 N.M.S.A. 1953 (Repl.Vol. 8, 1962 and 1975 Supp.).

Such addition appears to rectify the misinterpretation of U.C.C. 9–306(2) by the *Clovis* court and discussed in the January 1968 issue of the *Natural Resources Journal*. Emmerson, T.H., "Commercial Law Uniform Commercial Code—Security Interests in Livestock," 8 *Nat.Res.J.* 182 (1968).

Subsequent New Mexico case law acknowledges the addition to the U.C.C. In *Raley* the court cited *Clovis* for the proposition that consent by the secured party to the sale of the collateral resulted in loss of the security interest. *Raley, supra*, 90 N.M. at 723, 568 P.2d 246. There the *Raley* court found "*express* authorization to sell." *Supra* at 724, 568 P.2d 246. Judge Sutin III, in a special concurrence, noted that the "1968 amendment provided that

only an expressly authorized sale would discontinue the security interest." *Supra* at 726, 568 P.2d 246.

In *Security National Bank*, the Court of Appeals noted that the *North Central* court expressly rejected the rationale in *Clovis* as inconsistent with the intent of the framers of the Uniform Commercial Code (U.C.C.). The *North Central* court was guided by a decision of the Kansas Supreme Court elaborating on the Kansas U.C.C. § 1–205(4):

> We ... find no waiver of a security interest, and no consent to the sales ... by PCA's failure to remonstrate with [the debtor], following his sales of [the collateral].

*North Central Kansas Production Credit Association v. Washington Sales Company, Inc.,* 223 Kan. 689, 577 P.2d 35, 41 (1978).

In *First National Bank* the court found that the security interest did not follow transfer of the collateral but in this case authorization by the secured party was very clear. The court in *Southern Properties* directly addressed the issue of what kind of "authorization" is intended by the U.C.C. and found that, although the security agreement was assumed by the transferor, "the secured party's security interest in transferred collateral is lost only where there is a clear manifestation of the secured party's intent that the collateral be transferred free and clear of its security interest." *Southern, supra* at 843.

In the instant case the facts are at some variance with the cases cited, (authorization of the sale was clear and in *Southern* the transferor assumed the security agreement) however, the significant thrust of the authorities as regards survival of the security interest is that § 306(2) protects, rather than defeats, security interests and only a clear authorization of the sale by the secured party will waive his security interest. *Southern, supra* at 843. The *Southern* court also noted that other courts "have assumed that 'authorization' means authorization to transfer free and clear of the security interest." Quoting *Central*

*California Equipment Company v. Dolk Tractor Company,* 78 Cal.App.3d 855, 862, 144 Cal.Rptr. 367, 371 (1978).

■ In the case at bar, PCA did not remonstrate against the sale but neither did PCA clearly authorize the sale of the collateral. There is no evidence that PCA intended nor understood that the transfer would be free and clear of liens. We conclude that PCA's security interest in the collateral survived the transfer from Chaves to CCC.

We next address whether PCA's security interest remained perfected by the filing of a Continuation Statement of the original agreement with Chaves. Determination of this issue is pivotal as to which party, the movant or the debtor-in-possession, has priority status vis-a-vis the collateral. Section 544 of the Bankruptcy Code provides that the trustee, as hypothetical lien creditor, defeats any holder of an unperfected security interest (11 U.S.C. § 544). Therefore, PCA must demonstrate that it had a properly perfected security interest in the property.

Under New Mexico law a financing statement must be filed in order to perfect a security interest in accounts receivable, inventory and equipment if same are not in the possession of the secured party. N.M. Stat.Ann. § 55–9–302(1) (1978). Also, under New Mexico law an unperfected security interest is subordinate to the rights of a lien creditor, including a trustee in bankruptcy. N.M.Stat.Ann. § 55–9–301. The requisites of financing statements include *inter alia* that a financing statement be signed by the debtor and the secured party. N.M.Stat.Ann. § 55–9–402(1) (1978).

There is case law holding that the filing of a new financing statement is not necessary to preserve the security interest where the collateral has been transferred to a new debtor. *In re matters of Ocean Electronics Corporation,* 461 F.Supp. 348 (S.D.Cal.1978), *In re Matto's, Inc.,* 8 B.R. 485 (Bankr.E.D.Mich.1981), *In re Southern Properties v. Hyman,* 44 B.R. 838 (Bankr.E. D.Va.1984), *In matter of Franchise Sys-*

*tems, Inc.,* 46 B.R. 158 (Bankr.N.D.Ga. 1985).

*Ocean's* facts are substantially similar to the case at bar. The transferor sold property subject to the security interest of the bank to the transferee without knowledge or consent by the bank. Subsequent to discovery of the sale of the secured property, the secured party and the transferee discussed "possible assumption" by the transferee of the transferor's indebtedness. During this time the transferee paid and the bank accepted payments owed by the transferor. The debt was never expressly assumed by the transferee. Eventually the transferor filed a voluntary petition in bankruptcy under chapter 11. The bankruptcy judge ruled that despite the lack of consent to the transfer, the failure of the secured party to file a financing statement naming the transferee as the debtor was fatal to the maintenance of his perfected security interest. The District Court reversed the bankruptcy decision. The gravamen of the appellate decision lay in Article 9 subsections 6 and 7 of the California Uniform Commercial Code which provide that:

 (6) a filed financing statement remains effective with respect to collateral transferred ... even though the secured party knows of or consents to the transfer.

 (7) ... whether a new filing is necessary where the collateral has been transferred from one debtor to another ... This Article now answers the question in the negative.

California Commercial Code § 9402.

In *Southern* the court offers a policy discussion concerning the apparent conflict in U.C.C. Article 9 between the provision of a notice-type system and preservation of a secured party's interest in collateral. The Court concludes that the apparent variance is resolved by placing additional searching requirements upon the potential secured party. This conclusion is based upon the Official Comment to Virginia U.C.C. 402(7). (emphasis added) *Southern, supra,* 44 B.R. at 845.

Strikingly, these cases all rely on U.C.C. § 9–402(7). A different result occurs where the jurisdiction has not adopted the 1972 Amendments to the U.C.C. which include subsections 6 and 7. The Court in *In re White* addressed a similar issue to the case at bar. The debtor converted from a partnership to a sole proprietorship with the knowledge of the secured party who had a perfected security interest in the partnership's accounts receivable, inventory, machinery and vehicles, then owned or thereafter acquired. The secured party did not file an amended financing statement identifying the "new debtor." The Court noted that Tennessee had enacted the 1972 Amendments to the U.C.C., effective January 1, 1986, and that cases involving U.C.C. § 9–402(7) were immaterial to the issue before the court. *In re White,* 51 B.R. 514 (Bankr.E.D.Tenn.1985). Without the reference of § 9–402(7) the focus of the decision lay in the notice purpose of the financing statement. "A party searching the records would not discover [the secured party's] lien unless the party knew [the debtor] did business under the [new] trade name." *White, supra* at 517. The Court found that the failure to file an amended financing statement identifying the name of the "new" debtor was seriously misleading and upheld the bankruptcy trustee's objection to the secured party's perfected status.

In the case at bar, PCA had a perfected security interest vis-a-vis Chaves; PCA had knowledge of the transfer of the collateral to CCC and accepted payments from CCC on the Chaves note for ten months. PCA never amended its financing statement to identify CCC as the new debtor. Rather, PCA filed a Continuation Statement naming Chaves as the debtor, a situation which PCA knew to be inaccurate.

■ PCA stretches believability when it contends that the filing of a Continuation Statement naming a debtor whom it knows is no longer in possession of the collateral and is an unrelated corporate entity, will suffice to preserve its perfected status. This tortured belief is stressed further because U.C.C. 9–402(6) and (7) were not the

law extant in New Mexico at the time in question. These subsections are part of the 1972 Amendments to the U.C.C. and were not effective in New Mexico until January 1, 1986. Without the application of subsections 6 and 7 the focus of scrutiny is on whether the identification of an "old" debtor on a Continuation Statement would be seriously misleading to parties searching the records to discover existing liens. The answer must be in the affirmative. Therefore, we find that PCA's security interest in the collateral described in its security agreement with Chaves is unperfected and thus, subordinate to the status of the debtor-in-possession.

The facts of this case are such that we are prompted to find that, even if the 1972 Amendments to the U.C.C. were the law in New Mexico, at the time in question, PCA's status would be subordinate to the debtor-in-possession. After the transfer of the collateral to CCC, PCA gave new money, 2.9 million dollars, to CCC. It must be apparent that if PCA did not allow the express assumption of Chaves' indebtedness by CCC, that the money advanced to CCC was unsecured. At no time did PCA have any written documents signed by CCC evidencing any indebtedness of CCC. Therefore, the monies advanced by PCA to CCC were unsecured and PCA is an unsecured creditor of CCC for that amount.

Having found that PCA's status is that of an unsecured creditor, determination of whether new collateral acquired by CCC is subject to PCA's security interest and whether PCA must trace the proceeds is obviated.

This memorandum constitutes findings of fact and conclusions of law. Bankruptcy Rule 7052.

An appropriate judgment shall enter.